IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE DISTRICT OF SOUTH CAROLINA
ANDERSON/GREENWOOD DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | CRIMINAL NO. 8:18cr586 |
| | ) | |
| vs. | ) | SENTENCING MEMORANDUM |
| | ) | |
| JEFFREY LEE HARRIS. | ) | |
| | ) | |

NOW COMES the Defendant, Jeffrey Lee Harris, by and through his attorney, Thomas J. Quinn, and respectfully submits to the Court for consideration in determining an appropriate sentence in his case the attached psychological evaluation conducted by Dr. Karl R. Bodtorf. Counsel would request that report be made a part of this memorandum by reference.

Respectfully submitted,
 s/Thomas J. Quinn
Thomas J. Quinn
109 Laurens Road, 4-D
Greenville, South Carolina 29607
(864) 232-9590
attytquinn@msn.com

January 22, 2019
Greenville, SC

# Karl R. Bodtorf, Psy.D.

302 West Main Street • Taylors, SC 29687 • Tel 1-864-244-1007

**PSYCHOLOGICAL EVALUATION**
PSYCHOSEXUAL FOCUS

Client Name:         Jeffrey L. Harris
Date of Birth:       03/04/86
Education:           High School + "Some College"
Date of Evaluation:  11/26/18

**REASON FOR REFERRAL**

Jeffrey L. Harris is a thirty-two year old single white male who was referred to this office for a psychological evaluation. This assessment was requested to determine what if any psychological and/or sexual problems Mr. Harris may possess, as well as to determine what if any psychological services may be indicated.

**BEHAVIORAL OBSERVATIONS**

Mr. Harris was found to be dressed casually though appropriately wearing a gray long sleeve shirt (with Affliction Clothing Company logos on the front and back), blue jeans, no socks, and sandals. His hair is black in color and relatively short with respect to length. His eyes are brown/hazel in color. Mr. Harris does have a mustache and beard. Jeffrey reports a height of six feet four inches and a weight of two hundred fifty pounds. His overall appearance was relatively neat and he was well groomed. He is right hand dominant. This client's speech was clear and understandable though softly modulated at times. He does wear prescription glasses, and with respect to auditory deficits, mentions that he is "…sometimes hard of hearing…". This individual's gross motor and fine motor skills were age and task appropriate as was his general activity level. He appeared to readily understand the instructions to the various tasks administered as well as the questions that were posed on this date. His attitude and motivation was appropriate. His ability to concentrate appeared to be largely within normal limits. No bizarre behaviors were evidenced. It is believed that his performance was optimal and that the results reflect his current level of functioning. This client was somewhat reserved early on in the interview and was not so spontaneous in his interactions with the undersigned. Across time, on a relative basis, he did become more interactive.

Jeffrey was able to provide correct information as it relates to: location of this office, today's date, his date of birth, and age. Mr. Harris was able to spell his last name both forwards and backwards. He was successful spelling the word 'world' backwards as well as remembering the names of three objects after distraction tasks. Jeffrey began to do serial seven calculations correctly though at the second subtraction he seemed to be somewhat stymied and gave up on the task. This client was able to deconstruct the meaning of two proverbs: 'don't cry over spilt milk' and a 'chain is only as strong as its weakest link'. This individual's mood and affect were found to be somewhat dysphoric.

krbpsyd@aol.com

His attitude about himself came across as being somewhat 'dark' and pessimistic. In general Jeffrey did not show a great deal of emotion during the interview. He does possess a SC driver's license and drove to the assessment on this date.

## CURRENT OFFENSE

Mr. Harris indicates that federal officers [Department of Homeland Security] came to his home in late May of this year for a 'knock and talk' as it relates to his use of the dark web. Information forwarded to this office indicated that local HSI had received information from Colorado that linked Mr. Harris to a website - Welcome 2 Video - ("W2V") known to purvey child pornography. Mr. Harris initially indicated that he did access the dark web to view movies but denied having viewed child pornography. When confronted about having a bitcoin account, Jeffrey did acknowledge having accessed such materials and had done so since his middle teens. This matter was heard in Federal Court [Anderson] in October of this year when Mr. Harris entered a guilty plea. He is awaiting sentencing which will likely take place between now and the end of the year.

## BACKGROUND INFORMATION

Jeffrey indicates that he is originally from Aurora, Colorado though his family relocated to South Carolina when he was in kindergarten. According to his report, his biological parents divorced when he was some seven years of age. His mother was awarded full custody and his father was granted visitation rights. According to his report, he has two sisters and four half-brothers. His memories with respect to his formative years were couched in less than favorable terms. Per his account he was the victim of both physical and emotional abuse. He described his mother as having a "good heart...good intentions" but was often ruled/manipulated by the men in her life. Jeffrey's verbalizations with respect to his biological father were less than positive, "not the greatest person...99% of my birthdays he was not there...". He described him as having been physically and emotionally abusive. His mother went on to marry three other men. Mr. Harris also describes them as having been abusive as well, noting that "...I never had a good stepfather...they were okay in public but not behind closed doors...". During his childhood he attended the Church of God of Prophecy which is a Pentecostal Holiness Christian denomination. This client did experience a rather traumatic event at the age of six. He was said to have been attacked by a Chow dog resulting in significant and disfiguring injuries which required surgery to reattach the left side of his face including his left eyelid.

According to his report, his bilirubin levels were quite elevated at his birth ("31"). Levels above 25 if not effectively treated, can result in a myriad of problems (e.g. deafness, cerebral palsy, as well as other possible brain disorders). Jeffrey indicated that school was somewhat of a challenge for him as a result of some developmental delays. School records would tend to support his assertions in this regard. For example, in kindergarten Jeffery was having significant speech difficulties and was exhibiting issues with attention and impulse control. His performance on a measure of intelligence at that time revealed a Verbal IQ of 78 (borderline intelligence), a Performance IQ of 98 (average), and a Full Scale IQ of 86 (low average). Later on, school personnel (3rd grade class room teacher

and resource teacher) noted a variety of issues: below average listening skills, poor language development, uneven socialization skills, poor interpersonal relationships, emotional instability, impulsiveness, difficulties with verbal expression, limited academic vocabulary, difficulties with written expression, oral comprehension difficulties, problems following through with oral instructions, and immaturity. An intelligence test (WISC-III administered that same year revealed relatively average scores: Verbal IQ of 98, Performance IQ of 93, and Full Scale IQ of 95. His classroom performance was falling below his obtained level of intelligence. Jeffrey noted that early on in his school years he often got into fights including on one occasion with one of his teachers. Per his account the fights "stopped by the fifth grade". Jeffrey did go on to graduate from high school and attended the local technical college.

**SEXUAL DEVELOPMENT**

On the Sexual History Questionnaire Mr. Harris indicates that he is heterosexual. Per his account he learned about sexual matters in school (sex education) when he was some twelve to thirteen years of age. Jeffrey noted that when he was some nine years of age his niece "...undressed and kissed me on the lips and on my penis...". When he was some twelve years of age an "unknown girl" sat beside him on the school bus and "...slid down hand in shorts...trying to touch my genitals...". He noted that his parents told him "nothing" about sexual matters. He discovered masturbation around the age of sixteen. His parents informed him "...that masturbation was bad...". Jeffrey began dating at around the age of sixteen. When asked about his first sexual experience, he states that he is single and has never had a sexual encounter or relationship. When asked why that might be so he replies "...I never cared to try...I have an inferiority complex...". Mr. Harris indicates that he has never been to a strip club, nor has he ever utilized the services of a prostitute. He acknowledges that he has looked at more pornography than the average individual and speculates that he does have an addiction to such materials. Per his account he has viewed both adult and adolescent pornography (heterosexual) including soft core and hard core type materials via the Internet. According to his report the last time he viewed such materials was some seven moths ago (i.e. adult and adolescent - ages fourteen and up). When questioned as to whether or not there are 'victims' with respect to the pornography 'industry' he replies "yes...pornography is a sense degrading women and has negative impacts on social life for the victims". When asked that same question about child pornography Jeffrey indicted "...at first no b/c they seem to enjoy themselves...later, yes...b/c some were tricked into risqué activities".

Jeffrey denies ever having entered any chat-rooms of a sexual nature. He likewise states that he has never attempted to interact with a minor over the Internet to talk about sexual matters. This client denies ever having had sexual contact with a minor. He also indicates that he has never been accused of having inappropriate contact with a minor.

Information forwarded to this office indicate that Jeffrey has been viewing child pornography since the age of sixteen or so. Mr. Harris recalled having seen the movie 'The Devils Advocate" at the age of twelve/thirteen and notes that "...I went off the deep end after that...". According to his report he initially began visiting "regular" pornographic websites but noted that sometimes there was a "blend" of legal and illegal

material. Per his account his descent down the "rabbit hole was gradual". Later on (i.e. 2016) he began using the browser "Tor" to access the dark web. He then began accessing illegal materials via a VPN (Virtual Private Network) utilizing cryptocurrency to pay for subscriptions to "Welcome 2 Video" (W2V") which is a known purveyor of child pornography.

## MENTAL HEALTH HISTORY

Jeffrey indicates that he has some issues with depression off and on which started at about the age of twenty-one. According to his report it all began about the time that he made some statements about '9/11' while at work which were reportedly misinterpreted. It was his perception that people began to treat him differently. Mr. Harris denies ever having been involved with any formal treatment services for depression on either an inpatient for for that matter outpatient basis. He has never taken any medications for a psychiatric disorder. He did on occasion talk with his school counselors. He indicated that the depression is still present to a certain extent but notes that he recently (August-September) engaged in a forty-day fast that largely "got rid of" the depression. During the fasting he was "asking God for mercy and better relationships with people". Per his account, he dropped from two hundred fifty-four pounds to one hundred ninety-six pounds. Generally speaking, Jeffrey describes his appetite as above average. He describes his energy level as variable, noting that there are some days where he just doesn't "care". Mr. Harris acknowledges having had some past suicidal ideations dating back to his early twenties as well as some occasional thoughts "…with all of this…". He mentions in passing that reading the Bible gives him much "comfort". On the application for services form he identifies the following problems/concerns: nervousness, shyness, depression, inferiority feelings, fears, unhappiness, and tiredness. When asked about his mood on this date he replies that it is "in the middle", though earlier in our conversation he did note that he has "more days that are gray".

## SUBSTANCE ABUSE HISTORY

Mr. Harris indicates that he has never had any issues with either alcohol or drugs. Per his account he has never indulged in any drug use. He has been known to drink but according to his report it is rare that he does so.

## EMPLOYMENT BACKGROUND

Jeffrey was not gainfully employed at the time of this assessment and had not worked since May of this year. The majority of his employment was in the realm of security. Per his account he worked as a security guard for two different companies, one for twelve months and the other for ten years. He has also worked as a cashier in the past (e.g. Lowes and Piggly Wiggly). When asked what he might like to be doing in the future, he mentions that he has always been attracted to the idea of being a "researcher".

## INSTRUMENTS

1. Personality Assessment Inventory [PAI]
2. Psychopathic Personality Assessment Inventory-Revised [PPI-R]
3. Shipley-2
4. Sexual Adjustment Inventory [SAI]
5. Internet Sex Screening Test
6. Sexual Violence Risk -20 [SVR-20]
7. Sexual History Questionnaire
8. Clinical Interview
9. Collateral Information: Discovery (75pp.)

## EVALUATION RESULTS

### PERSONALITY

**Personality Assessment Inventory:** Mr. Harris was given the PAI, a generalized measure of personality. This instrument provides a number of validity indexes that are designed to provide an assessment of factors that could distort the results of testing. Such factors could include failure to complete test items properly, carelessness, reading difficulties, confusion, exaggeration, malingering or defensiveness. For this protocol, the number of uncompleted items was within normal limits. Test results would suggest that Jeffrey did attend to item content and responded in a consistent fashion to similar items. There is no evidence to suggest that he was unduly defensive (i.e. he did not attempt to present himself in a favorable light). There were some subtle indicators that he may have attempted to portray himself in a negative light, though the results are considered valid.

This client's profile is associated with individuals who have prominent depression along with hostility. He is likely rather pessimistic and believes that many of his negative life circumstances are the result of the shortcomings of those around him. It is rather probable that he possesses little in the way of hope for his situation to improve. Given these factors it is likely that Mr. Harris is rather sensitive in his interactions with others and because of this prefers to withdraw/isolate. Jeffrey is the type to feel as if he is being treated inequitably and will tend to hold grudges against others even if the affronts were unintentional. The presence of depression is supported by test findings. Jeffrey is likely to be plagued with a negative perspective (i.e. worthlessness, hopelessness, and personal failure). Test results would also reflect the presence of some PTSD (Post Traumatic Stress Disorder) type symptomatology.

Jeffrey's self-concept involves a fairly negative self-appraisal. During stressful times he can be expected to be self-self-critical and quite pessimistic. From an interpersonal standpoint this client appears to be rather withdrawn and introverted. It would appear that he has very little interest in socializing. His social network would be expected to be quite small. This client does acknowledge having recurrent thoughts related to a suicidal act. While only a small percentage of individuals who entertain such thoughts act on them, his treatment providers should never-the-less be attuned to this fact. From an anger management standpoint, Mr. Harris describes himself as being rather meek and unassertive. He may have difficulties standing up for himself even when it is to his advantage to do so.

**Psychopathic Personality Inventory-Revised:** This client was also given the PPI-R. This particular test is a 154-item self-report measure of both global psychopathy and the component traits of psychopathy. The PPI-R is construct valid, time efficient, and can detect response styles potentially relevant to psychopathy (i.e., positive or negative impression management, random or careless responding). Rather than focusing exclusively on antisocial or criminal behaviors, the PPI-R measures the continuum of psychopathic personality traits present in a range of individuals and can be used in both clinical (forensic) and non-clinical (community) settings.

Mr. Harris' results on the PPI-R were found to be statistically valid, that is to say that Jeffrey responded to test items in a forthright manner and did not attempt to present a picture of himself that was either more positive or more negative than his circumstances might warrant. None of the scales on this instrument were significantly elevated, including his overall 'total' score. His results would suggest that he does not possess those traits/characteristics that are common in those individuals who are diagnosed with a psychopathic personality.

**Sexual Adjustment Inventory:** Jeffrey was also given the SAI. This particular instrument was designed specifically for the purpose of sexual offender assessment and screening in order to identify sexually deviate and/or paraphilic behavior in individuals accused or convicted of sexual offenses.

His score on the "Test Item Truthfulness Scale" fell at the 48th percentile, which is in the medium risk range (40-69th percentile). Scores in this range are consistent with individuals who are non-defensive and truthful to their responses on the SAI. Truth corrected scale scores are believed to be accurate.

Mr. Harris' score on the "Sex Item Truthfulness Scale" fell at the 62nd percentile, which is in the medium risk range (40-69th percentile). It would appear that Jeffrey was attempting to minimize his sex related problems. Truth corrected scale scores are believed to be accurate.

This client's score on the "Sexual Adjustment Scale" fell at the 79th percentile, which is in the problem risk range (70-89th percentile). Mr. Harris acknowledged certain sexual adjustment issues (e.g. unsatisfying sex life, watching internet pornography, masturbation as a release, views his sexual adjustment as not normal).

Jeffrey's score on the "Child Molest Scale" fell at the 39th percentile, which is in the low risk range (0-39th percentile). An established pattern of pedophile interests, tendencies and behaviors are not evident at this time. Low scorers are unlikely to engage in child molest type behaviors.

His score on the "Sexual Assault Scale" fell at the 5th percentile, which is in the low risk range (0-39th percentile). Low risk scorers have a very low probability of committing sexual assaults.

His score on the "Exhibitionism Scale" fell at the 18th percentile, which is in the low risk range (0-39th percentile). Low risk scorers do not intentionally expose themselves to unsuspecting strangers.

This client's score on the "Violence Scale" fell at the 21st percentile, which is in the low risk range (0-39th percentile). Low risk scorers are typically nonviolent.

Mr. Harris' score on the "Antisocial Scale" fell at the 90th percentile, which is in the severe problem risk range (90-100th percentile). Jeffrey did acknowledge possessing a variety of antisocial type thoughts/attitudes (e.g. animosity toward others, strong opinions that some may consider antisocial).

His score on the "Distress Scale" fell at the 92nd percentile, which is also in the severe problem risk range (90-100th percentile). This client would appear to be experiencing a variety of stressors, though suicidal thinking was not admitted.

Jeffrey's score on the "Impulsiveness Scale" fell at the 73rd percentile, which is in the problem risk range (70-89th percentile). There is evidence to suggest that he may have issues with engaging actions prior to thought.

This individual's scores on both the "Alcohol Scale" as well as the "Drugs Scale" were found to fall at 0, which is in the low risk range (0-39th percentile). Few if any indicators of alcohol or drug abuse would appear to be present.

**Internet Sex Screening Test:** This test is designed to assist in the assessment of sexually compulsive or "addictive" online behavior. It is appropriate to administer this test in a wide variety of settings(e.g. hospitals, treatment programs, and private therapists). Mr. Harris' score on this test was fifteen (15). A score of nine (9) to eighteen (18) is consistent with individuals who are "at risk". Embedded in this test are some additional items that if endorsed will further elevate one's risk level. Jeffrey endorsed five (5) out of the nine (9) additional items. His risk level therefore increases, making him at a greater risk for sexual acting out behavior on the Internet.

**Sexual Violence Risk-20:** The undersigned also employed the SVR-20 in evaluating Mr. Harris' circumstances. This instrument was designed to provide a structured analysis of an offender's overall circumstances as it relates to estimating the risk of future sexual violence. Some twenty different factors are reviewed across three major dimensions: psychosocial adjustment, sexual offenses, and future plans. In examining these dimensions, there were four factors that elevate his risk for recidivism (acknowledged interest in child pornography, past victim of abuse (physical and sexual), relationship problems, and employment problems). His risk level would be considered to be moderate. This is a pre-treatment assessment. Assuming successful participation and completion of sexual offender specific counseling, his risk rating would decrease.

## CONCLUSIONS

Mr. Harris participated in a comprehensive assessment comprised of a clinical interview, mental status exam, psychological testing, as well as a review of collateral information. In the interview Jeffrey came across as being somewhat reserved early on, though across time he did become more interactive. During the interview this client did make a number of references to biblical passages. He also mentioned having fasted for some forty days, praying for mercy as it relates to the circumstances in which he finds himself. There were

also certain statements made during the interview that reflected some underlying distrust, if not low levels of paranoia. Generally speaking though Mr. Harris was fully cooperative in his interactions with the undersigned, and was able to provide his circumstances in a clear and coherent fashion. He does not debate the charges lodged against him and acknowledges responsibility for his actions. He possesses average intelligence and has the cognitive resources to participate in, and benefit from treatment. While relatively open with the undersigned during the interview, he was somewhat guarded when responding to written questions related to sexual content.

Anecdotal information would suggest that Mr. Harris' formative years were not the most positive what with: abandonment by his biological father, physical and emotional abuse perpetrated by his father as well as his stepfathers, trauma associated with having been attacked by a dog, as well as some sexual abuse. Jeffrey acknowledges having had sporadic issues with depression through the years though he has never been involved with any ongoing treatment. His early sexual development would be described as having been within normal limits though there were issues with self-esteem (i.e. self-diagnosed "inferiority complex"). These issues negatively impacted his involvement with members of the opposite sex. For example he noted that he "...only dated for school prom in the twelfth grade...". His interest in pornography in general and child pornography in particular dates back a relatively long number of years though his descent into the "rabbit hole" with respect to child pornography was said to have been a gradual process.

Psychological testing results for the most part tended to confirm the anecdotal information mentioned above as it relates to: depression, paranoia, traumatic stress, and social isolation/withdrawal (i.e. a significant lack of social connectivity - very little in the way of motivation as it relates to social interactions). His results on a measure of sexual adjustment were found to be somewhat mixed. Mr. Harris was open when responding to questions about non-sexual matters and issues were identified in the areas of: antisocial thought and actions, distress, and impulsiveness. Jeffrey was less than forthcoming when answering questions about sexual matters. Defensiveness such as this is not unusual especially if the client has yet to have had their day in court. Even so, he acknowledges having sexual adjustment concerns.

While it is apparent that Mr. Harris does have a demonstrated interest in child pornography and therefore would be technically labeled as a pedophile, I am not inclined to think that he has much in common with those individuals that would be identified as a predator. To my knowledge there have been no reports that Mr. Harris has attempted to interact with minors over the Internet nor is there information to suggest that he has ever been accused of doing so face-to-face. So-called 'virtual' offenders (i.e. individuals who access child pornography via the Internet) are also believed to be quite different from 'classic' pedophiles. 'Virtual' offenders are believed to engage in sexual fantasy to escape problems in their lives and may have an addiction to pornography versus the 'classic' pedophiles who make conscious efforts to access children so that they can use them for self-gratification (driven by the need for power, control, revenge or anger). 'Virtual' offenders tend to have Internet interests that go well beyond 'Child Themes', while 'classic' pedophiles have a much more narrow focus aimed exclusively at minors/children.

Distinctions such as these are not meant to minimize the criminal offense or the impact of child pornography on children but rather it is offered to contrast the difference between these two types of offenders. 'Classic' offenders tend to be master manipulators while 'virtual' offenders are often somewhat under-socialized.

Mr. Harris would be considered an appropriate candidate for rehabilitation and would benefit from involvement in a structured treatment program aimed at individuals with sexual compulsions, addictions, and/or deviance. 0Involvement in a program such as the Sexual Behavior Accountability Group, (which is a 12-month outpatient counseling program designed for individuals who have come to the attention of the authorities for computer related crimes, such as possession of child pornography, criminal solicitation of a minor, and sexting) is both warranted and appropriate. Assuming successful participation and completion of such a program along with adhering to guidelines for probation and/or community supervision, his risk to the community would be described as low.

### DSM V DIAGNOSTIC IMPRESSIONS

Listed below are the DSM-V diagnostic possibilities suggested by the results from the psychological testing along with other clinical information.

296.99. Disruptive Mood Dysregulation Disorder
309.81. Posttraumatic Stress Disorder
302.2.  Pedophilic Disorder


_____
Karl R. Bodtorf, Psy.D.